**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| SAMANTHA FETZNER, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KALAHARI RESORTS, LLC,<br><br>Defendant. | Case No. ________________<br><br>**CLASS REPRESENTATION**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Samantha Fetzner ("Plaintiff"), individually, and on behalf of all others similarly situated, brings this action against Defendant Kalahari Resorts, LLC ("Kalahari Resorts" or "Defendant"). Plaintiff brings this action by and through her attorneys, and alleges, based upon personal knowledge as to her own actions, and based upon information and belief and reasonable investigation by her counsel as to all other matters, as follows.

## I. INTRODUCTION

1. Defendant operates indoor waterpark and resort facilities across five states.

2. As part of its operations, Defendant collects, maintains, and stores highly sensitive information concerning Defendant's current and former employees, guests, and convention attendees, including their "personally identifying information" ("PII").

3. Defendant had obligations pursuant to law, contract, and recognized industry standards to keep PII in its possession secure from a data breach.

4. Defendant had obligations pursuant to law, contract, and recognized industry standards to keep its PII in its possession secure from a data breach.

5. Despite Defendant's obligations to keep PII secure, on or before October 9, 2026, cybercriminals infiltrated Defendant's systems and successfully stole vast quantities of sensitive PII belonging to Defendant's current and former employees, guests, and convention attendees, including Plaintiff and Class members (the "Data Breach").

6. The PII impacted in the Data Breach includes names, addresses, dates of birth, and Social Security numbers (collectively, "Private Information").

7. According to information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity and failed to maintain reasonable data security safeguards or protocols to protect sensitive and confidential Private Information in its possession. In short, Defendant's failures placed Plaintiff and Class members' Private Information in a highly vulnerable position, rendering them easy targets for cybercriminals.

8. Accordingly, Plaintiff brings this action on behalf of all those similarly situated to seek relief for, *inter alia*, the consequences of Defendant's failure to reasonably safeguard their Private Information; its failure to reasonably provide timely notification to Plaintiff and Class members that their Private Information had been compromised; and for Defendant's failure to inform Plaintiff and Class members concerning the status, safety, location, access, and protection of their Private Information.

## II. PARTIES

**Plaintiff Samantha Fetzner**

9. Plaintiff Samantha Fetzner is a resident and citizen of Marengo, Illinois. Plaintiff Fetzner was a guest at Kalahari Resort Wisconsin. Plaintiff Fetzner provided her PII to Defendant.

**Defendant Kalahari Resorts, LLC**

10. Kalahari Resorts, LLC is a Wisconsin limited-liability-company with its principal place of business located at PO Box 590, Wisconsin Dells, WI 53965. Defendant conducts business across five states, including in Wisconsin.

## III. JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, the number of class members exceeds 100, and at least one Class member is a citizen of a state different from Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

12. This Court has personal jurisdiction over Defendant because Defendant is headquartered in Wisconsin.

13. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's and Class members' claims occurred in this District and because Defendant resides in this District.

## IV. FACTUAL ALLEGATIONS

### A. Kalahari Resorts, LLC – Background

14. Defendant operates five resort properties across Wisconsin, Ohio, Pennsylvania, Texas, and Virginia. The resort properties include indoor waterpark facilities, hotels, as well as business convention facilities.

15. As a lodgings and other services provider, Defendant collects, maintains, and stores large volumes of Private Information belonging to its current and former employees, guests, and convention attendees as part of its general business operations.

16. By collecting and maintaining their Private Information, Defendant agreed it would safeguard it in accordance with its internal policies, industry standards, state law, and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their Private Information.

17. Upon information and belief, Defendant failed to implement necessary data security safeguards at the time of the Data Breach. This failure resulted in cybercriminals accessing the Private Information of Defendant's current and former employees, guests, and convention attendees—Plaintiff and Class members.

18. Current and former current and former employees, guests, and convention attendees of Defendant, such as Plaintiff and Class members, made their Private Information available to Defendant with the reasonable expectation that any entity with access to this information would keep that sensitive and personal information confidential and secure from illegal and unauthorized access. They similarly expected that, in the event of any unauthorized access, these entities would provide them with prompt and accurate notice.

19. This expectation was objectively reasonable and based on an obligation imposed on Defendant by statute, regulations, industrial custom, and standards of general due care.

20. Indeed, Defendant represents that:

a. "[Kalahari] are committed to safeguarding the privacy of every individual who registers with or visits our properties . . ."

b. "We will not sell or rent any personal information collected with any party not affiliated with us without your express written consent . . ."[1]

[1] https://www.kalahariresorts.com/legal/.

21. Had they known that Defendant's systems were vulnerable and open to attack, Plaintiff and Class members, as reasonable individuals, would not have provided their Private Information from Defendant; instead, they would have sought out a competitor for their lodging and other needs.

22. Unfortunately for Plaintiff and Class members, Defendant failed to carry out its duty to safeguard sensitive Private Information and provide adequate data security. As a result, it failed to protect Plaintiff and Class members from having their Private Information accessed and stolen during the Data Breach.

## B. <u>Defendant's Preventable Data Breach</u>

23. According to Defendant's public statements, cybercriminals breached Defendant's information systems on or about October 9, 2026. On October 16, 2026, internal investigation by Kalahari staff discovered that personal information of current and former employees, guests, and convention attendees, including their names, addresses, dates of birth, and Social Security numbers, was compromised in the incident.

24. The notorious ransomware gang "INC Ransom" claimed responsibility for the successful attack.

25. On November 9, 2026, Defendant began notifying state attorney generals of the Breach. However, as of the date of this pleading, Defendant has not yet sent notice of the Data Breach directly to victims.

26. On information and belief, the cybercriminals accessed and obtained Private Information belonging to current and former current and former employees, guests, and convention attendees during the Data Breach, as is the *modus operandi* of cybercriminals in these types of data incidents.

27. Defendant has not provided a definitive figure or estimate for the total number of individuals whose Private Information was compromised in this incident, however, their report to the Texas Attorney General stated that at least 13,000 Texas residents were impacted. Upon information and belief, similar numbers of people were likely affected in each state where Defendant maintains a property.

28. Defendant's statements do not disclose the specific date the security event began, the identity of the perpetrators, the full scope of data affected, or the total number of individuals whose Private Information was compromised. Defendant has also remained silent on the specific date or dates on which unauthorized access occurred, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these omitted details have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

29. Defendant's inadequate security practices caused the Data Breach. Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the Private Information. Thus, Defendant caused widespread injury and monetary damages to Plaintiff and Class Members.

**C. <u>Defendant's Many Failures Both Prior to and Following the Data Breach</u>**

30. The Data Breach and the injuries it caused to Plaintiff and Class members occurred as direct, proximate, and foreseeable results of multiple failings on the part of Defendant.

31. First, Defendant inexcusably failed to implement reasonable security protections to safeguard its information systems and databases.

32. Second, Defendant failed to inform the public that its data security practices were deficient and inadequate. Had Plaintiff and Class members been aware that Defendant did not have adequate safeguards in place to protect such sensitive Private Information, they would have never provided such information to Defendant.

33. Due to Defendant's failure to prevent the Data Breach, the sensitive Private Information of Plaintiff and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class Members for years to come.

34. As explained by the global cybersecurity firm BlackFog, the *modus operandi* of cybercriminals is to exfiltrate private information through a data breach and then "post it on forums on the Dark Web where it will be sold for profit."[2]

35. Indeed, the Federal Trade Commission has explained that "data stolen from businesses ends up on the dark web where criminals buy and sell it to commit fraud, get fake identity documents, or fund their criminal organizations."[3]

**D. <u>Data Breaches are a Known, but Preventable, Threat</u>**

36. While the prevalence and severity of data breaches have increased exponentially over the past five years, the illicit trade of stolen data dates back to the earliest days of the internet. In the 1990s, cybercriminals sold stolen data through Internet Relay Chat (IRC) channels, which were primitive message boards and instant messaging services, before transitioning to dedicated web forums in the early 2000s.[4] These forums became havens for cybercriminals of all stripes

---

[2] Brenda Robb, *After the Data Breach – What Happens to Your Data*, BLACKFOG (July 27, 2025) https://www.blackfog.com/after-the-data-breach-what-happens-to-your-data/.
[3] John Krebs, *The dark web: What your business needs to know*, FED. TRADE COMM. (Oct. 17, 2017) https://www.ftc.gov/business-guidance/blog/2017/10/dark-web-what-your-business-needs-know.
[4] Thomas Holt, *How massive data breaches flood illicit markets while personal information fuels cybercrime economy*, Milwaukee Independent (November 12, 2025), available at

where "individuals advertised their services to other users. Forums quickly gained popularity and became successful businesses with vendors selling stolen credit cards, malware, and related goods and services to misuse personal information and enable fraud."[5]

37. A forum known as ShadowCrew, which operated for just two years before being shut down by a law enforcement task force operation in 2004, trafficked over 1.7 million stolen credit card details in the brief period of time it was online.[6]

38. The end of ShadowCrew did not dampen the illicit trade in stolen data. Instead, the trade moved to the dark web where it thrives to this day. Gone are the days of archaic IRC channels and dusty forums; stolen data is now traded on dedicated webpages serving as veritable e-commerce stores (akin to Amazon, eBay, and Alibaba) for stolen data of all kinds, complete with eye-catching webpages, distinct branding, and advertising to attract customers.[7] The vendors operating from these dark web storefronts are "frequently offer discounts and promotions to buyers to attract customers and keep them loyal," and offer clearance sales on old and/or expiring inventory, such as expiring credit card numbers, in a macabre reflection of commercial practices from the right side of the law.[8]

39. This decades-old black market for stolen data continues to thrive, and stolen PII, PHI, and financial account information are exchanged as simple commodities with prices set by the brutal and invisible hand of economics. Typically, online banking login information can be purchased for $100 each, full credit card details can be purchased for between $10 and $100, and

---

https://www.milwaukeeindependent.com/syndicated/massive-data-breaches-flood-illicit-markets-personal-information-fuels-cybercrime-economy/.

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

comprehensive data packages which can enable complete theft of an individual's identity can be purchased for $1,000 or more.[9]

40. For criminals, the ROI on purchased information can be exceptional despite the dubious nature of black-market dealings and the inherent risks therein. For example, a cybercriminal "who buys 100 cards for $500 can recoup costs if only 20 of those cards are active and can be used to make an average purchase of $30."[10] Based on these incentives, data breaches "are likely to continue as long as there is demand for illicit, profitable data."[11]

41. In this thriving black market, the producers are the cybercriminals who steal information to sell. And fueled by the voracious demand for stolen data in this thriving black market, dedicated gangs and organized crime rings have stepped up to meet the market demand, which has resulted in a precipitous increase in the number of data breaches in recent years.

42. The Identity Theft Resource Center's ("ITRC") Annual End-of-Year Data Breach Report for 2025 listed 3,322 data breach incidents which occurred in 2025, for which 232,726,796 individual victim notices were dispatched.[12] Indeed, 2025 handily dethroned 2023 as the most prolific year for data breaches, which previously held the title with 3,205 data breaches for which over 420 million individual victim notices were dispatched.[13]

---

[9] Ryan Smith, *Revealed-how much is personal information worth on the dark web?*, Insurance News (May 1, 2023), available at https://www.insurancebusinessmag.com/us/news/breaking-news/revealed--how-much-is-personal-information-worth-on-the-dark-web-444453.aspx.

[10] Thomas Holt, *How massive data breaches flood illicit markets while personal information fuels cybercrime economy*, Milwaukee Independent (November 12, 2025), available at https://www.milwaukeeindependent.com/syndicated/massive-data-breaches-flood-illicit-markets-personal-information-fuels-cybercrime-economy/.

[11] *Id.*

[12] *2025 Data Breach Report*, Identity Theft Resource Center (January 2026), available at https://www.idtheftcenter.org/publication/2025-data-breach-report/.

[13] *Id.*

43. Data breaches show no sign of abating. Statista, a German entity that collects and markets data relating to, *inter alia*, data breach incidents and the consequences thereof, reported 3,322 data breach incidents in the United States in 2025, 3,152 data breach incidents in 2024, 3,205 incidents in 2023, and 1,798 incidents in 2022.[14]




<u>Figure 1 – *Number of Data Breaches and Affected Individuals from 2005 to 2024.*</u> [15]

## E. <u>The Theft and Sale of Stolen Data Harms Victims</u>

44. Individuals who have unfortunately had their information stolen and sold on the black-market face severe consequences which belie the blatant ubiquity of such transactions. According to a recent study published in the scholarly journal *Preventive Medicine Reports*, public and corporate data breaches strongly correlate to an increased risk of identity theft for victimized

[14] *Number of data compromises and individuals impacted in the United States from 2021 to 2025*, Statista (February 15, 2026), available at https://www.statista.com/statistics/273550/data-breaches-recorded-in-the-united-states-by-number-of-breaches-and-records-exposed/.
[15] *Id.*

consumers, with one in four victims of a data breach inevitably experiencing some type of identity theft.[16]

45. Using this stolen information, criminals and other unsavory groups can fraudulently take out loans under the victims' names, open new lines of credit, open new bank accounts for purposes of committing fraud, and file fraudulent tax returns using stolen credentials.[17]

46. Victims can even face criminal charges as a result of identity theft and typically experience significant emotional distress:

> Having your identity stolen can be traumatic. Nearly 9 in 10 respondents (87%) in the ITRC survey reported feeling anxious or worried in the wake of identity theft; 77% felt violated, and an alarming 16% reported feeling suicidal in the months following identity theft. Identity theft victims report feeling unable to trust friends (34%) and family members (33%). More than half (52%) say they feel embarrassed or ashamed, even though ID theft can be difficult for the average person to detect and thwart, and some forms of identity theft, such as data breaches, are beyond the victims' control. Shame, suspicion and a feeling you should be curtailing your activity to prevent further theft can lead to isolation.[18]

47. These difficulties compound when Social Security numbers are compromised in a data breach. A victim is forbidden from proactively changing his or her number unless and until they can prove actual misuse and harm, and even this delayed remedial action is unlikely to undo the damage already done to the victims:

> Keep in mind that a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to

[16] David Burnes, Marguerite DeLiema, Lynn Langton, *Risk and protective factors of identity theft victimization in the United States*, Preventive Medicine Reports, Volume 17 (January 23, 2020), available at https://www.sciencedirect.com/science/article/pii/S2211335520300188?via%3Dihub.
[17] United States Social Security Administration, *Identity Theft and Your Social Security Number*, United States Social Security Administration (July 2021), available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.
[18] Gayle Sato, What Are the Unexpected Costs of Identity Theft? Experian (July 30, 2024), available at https://www.experian.com/blogs/ask-experian/what-are-unexpected-costs-of-identity-theft/.

> identify your credit record. So using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.[19]

48. The consequences of identity theft do not resolve quickly. In a survey of identity theft victims conducted by the Identity Theft Research Center (ITRC), 77% of respondents reported having at least some financial problems following identity theft, with 61% saying they had difficulty covering basic needs. Although 28% said they resolved their issues within six months of an ID theft incident, 65% said issues remained unresolved even after a year.[20]

49. On average, victims of identity theft spend $1,200 to restore their identity and resolve damage to their credit, which includes payments to specialists and attorneys and lost wages.[21]

50. Data breaches have also proven to be costly for affected organizations as well, with the average cost to resolve being $4.45 million dollars in 2023.[22] The average cost to resolve a data breach involving health information, however, is more than double this figure at $10.92 million.[23]

51. Furthermore, even if only a select few categories of Private Information is compromised in a breach, cybercriminals can use these pieces of stolen information to create a "mosaic" of information on each victim. In effect, cybercriminals can use the information stolen

---

[19] *Id.*
[20] *Id.*
[21] Alexandria White and Dan Avery, What is identity theft insurance? CNBC Select (March 17, 2025), available at https://www.cnbc.com/select/id-theft-insurance/#:~:text=Victims%20of%20identity%20theft%20spend,lost%20wages%20and%20other%20expenses.
[22] *Cost of a Data Breach Report 2023*, IBM Security, available at https://www.ibm.com/reports/data-breach?utm_content=SRCWW&p1=Search&p4=43700072379268622&p5=p&gclid=CjwKCAjwxOymBhAFEiwAnodBLGiGtWfjX0vRlNbx6p9BpWaOo9eZY1i6AMAc6t9S8IKsxdnbBVeUbxoCtk8QAvD_BwE&gclsrc=aw.ds.
[23] *Id.*

in one breach and connect it to other available information on the victims, which are data-mined from publicly available sources or illegally obtained from other breaches. Thus, even if certain categories of information such as emails, phone numbers, or credit card information were not compromised in this Data Breach, criminals can easily 'fill in the blanks' using these "mosaics" and correctly answer security questions and pass 2FA security checks, granting them access to victims' email accounts, financial accounts, and social media accounts to cause havoc.

52. A particularly troubling extension of these "mosaics" is the creation of "Fullz" packages. A "Fullz" package is a comprehensive dossier of information that cybercriminals compile on individuals, often through the use of automated programs, which represents an alarmingly accurate and complete profile of a given individual. These "Fullz" packages are sold for profit on the dark web to any individual willing and able to pay the price, be they cybercriminals seeking to perpetuate financial crimes, stalkers seeking information on their targets, or rivals seeking to destroy someone's reputation.

53. Upon information and belief, this has already transpired (and will continue to transpire) for Plaintiff and the Class. And any reasonable for any trier of fact will find that Plaintiff and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach. There is also a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported. Even data that has not yet been exploited by cybercriminals presents a concrete risk that the cybercriminals who now possess Class members' Private Information will do so at a later date or re-sell it.

54. Further, the harm experienced by victims of a data breach cannot be negated, even if the breached entity pays a ransom to the criminals. According to research by cybersecurity

experts: "cybercriminals often retain victim data even after being paid."[24] And, by paying a ransom, entities incentivize hackers to continue to commit additional data breaches. Indeed, more than one-third of entities that experienced a ransomware attack experience a second ransomware event.[25]

## F. Defendant Had a Duty and Obligation to Protect Private Information

55. Defendant has an obligation to protect the Private Information belonging to Plaintiff and Class members. First, this obligation was mandated by government regulations and state laws, including the FTC rules and regulations. Second, this obligation arose from industry standards regarding the handling of sensitive PII. Third, Defendant imposed such an obligation on itself with its promises regarding the safe handling of data. Plaintiff and Class members provided, and Defendant obtained, their information on the understanding that it would be protected and safeguarded from unauthorized access or disclosure.

### 1. FTC Act Requirements and Violations

56. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

---

[24] Connor Jones, *Greedy Ransomware Crews Return for Seconds after Victims Cough up First Extortion Payments*, The Register (July 22, 2026), https://www.theregister.com/security/2026/07/22/over-a-third-of-ransomware-victims-re-extorted-after-paying/5276218.
[25] *Id.*

57. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[26] The guidelines note businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.[27] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[28] Defendant clearly failed to do any of the foregoing, as evidenced by the length of the Data Breach, the fact that the Data Breach went undetected, and the amount of data exfiltrated.

58. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

59. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an

---

[26] *Protecting Personal Information: A Guide for Business*, Federal Trade Comm'n (October 2016), available at https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business (last accessed August 15, 2023).
[27] *Id.*
[28] *Id.*

unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

60. As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

61. Defendant was fully aware of its obligation to protect the Private Information of its current and former current and former employees, guests, and convention attendees, including Plaintiff and Class members. Defendant is a sophisticated and technologically savvy business that relies extensively on technology systems and networks to maintain its practice, including storing its current and former employees, guests, and convention attendees' Private Information in order to operate its business.

62. Defendant had and continues to have a duty to exercise reasonable care in collecting, storing, and protecting the Private Information from the foreseeable risk of a data breach. The duty arises out of the special relationship that exists between Defendant and Plaintiff and Class members. Defendant alone had the exclusive ability to implement adequate security measures to its cyber security network to secure and protect Plaintiff's and Class members' Private Information.

**2. <u>Industry Standards and Noncompliance</u>**

63. As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

64. Experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

65. The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[29]

66. The National Institute of Standards and Technology ("NIST") also recommends certain practices to safeguard systems, such as the following:

a. Control who logs on to your network and uses your computers and other devices.

b. Use security software to protect data.

c. Encrypt sensitive data, at rest and in transit.

d. Conduct regular backups of data.

e. Update security software regularly, automating those updates if possible.

f. Have formal policies for safely disposing of electronic files and old devices.

---

[29] *The 18 CIS Critical Security Controls*, CENTER FOR INTERNET SECURITY, https://www.cisecurity.org/controls/cis-controls-list (last visited Feb. 11, 2026).

g. Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

67. Further still, the United States Cybersecurity and Infrastructure Security Agency ("CISA") makes specific recommendations to organizations to guard against cybersecurity attacks, including: (i) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (ii) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (iii) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[30]

68. Defendant failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by

---

[30] *Shields Up: Guidance for Organizations*, CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY, https://www.cisa.gov/shields-guidance-organizations (last visited Feb. 11, 2026).

failing to comply with other industry standards for protecting Plaintiff's and Class Members' Private Information, resulting in the Data Breach.

69. Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**3. Defendant's Own Stated Policies and Promises**

70. Defendant's own published privacy policy states that:

a. "[Kalahari] are committed to safeguarding the privacy of every individual who registers with or visits our properties . . ."

b. "We will not sell or rent any personal information collected with any party not affiliated with us without your express written consent . . ."[31]

71. Defendant failed to live up to its own stated policies and promises with regards to data privacy and data security as cybercriminals were able to infiltrate its systems and steal the Private Information belonging to Plaintiff and Class members.

**G. Plaintiff and the Class Suffered Harm Resulting from the Data Breach**

72. Like any data hack, the Data Breach presents major problems for all affected.[32] As discussed in detail above, Plaintiff and the Class are highly likely to experience identity theft as a result of the Data Breach and, as also discussed in detail above, they are highly likely to experience significant harm as a result.

73. Here, due to the Data Breach, Plaintiff and Class members have been exposed to injuries that include, but are not limited to:

a. Theft of Private Information;

---

[31] https://www.kalahariresorts.com/legal/.

[32] Paige Schaffer, *Data Breaches' Impact on Consumers*, Insurance Thought Leadership (July 29, 2021), available at https://www.insurancethoughtleadership.com/cyber/data-breaches-impact-consumers.

b. Costs associated with the detection and prevention of identity theft and unauthorized use of financial accounts as a direct and proximate result of the Private Information stolen during the Data Breach;

c. Damages arising from the inability to use accounts that may have been compromised during the Data Breach;

d. Costs associated with time spent to address and mitigate the actual and future consequences of the Data Breach, such as finding fraudulent charges, cancelling and reissuing payment cards, purchasing credit monitoring and identity theft protection services, placing freezes and alerts on their credit reports, contacting their financial institutions to notify them that their personal information was exposed and to dispute fraudulent charges, imposition of withdrawal and purchase limits on compromised accounts, including but not limited to lost productivity and opportunities, time taken from the enjoyment of one's life, and the inconvenience, nuisance, and annoyance of dealing with all issues resulting from the Data Breach, if they were fortunate enough to learn of the Data Breach despite Defendant's delay in disseminating notice in accordance with state law;

e. The imminent and impending injury resulting from potential fraud and identity theft posed because their Private Information is exposed for theft and sale on the dark web; and

f. The loss of Plaintiff's and Class members' privacy.

74. As a direct and proximate result of Defendant's acts and omissions in failing to protect and secure Private Information, Plaintiff and Class members have been placed at a substantial risk of harm in the form of identity theft, and they have incurred and will incur actual damages in an attempt to prevent identity theft.

75. Plaintiff retains an interest in ensuring there are no future breaches, in addition to seeking a remedy for the harms suffered as a result of the Data Breach on behalf of both themselves and similarly situated individuals whose Private Information was accessed in the Data Breach.

## G. PLAINTIFF'S EXPERIENCES

76. Plaintiff Samantha Fetzner was a guest at Defendant's Wisconsin property. Prior to and during her visit, Plaintiff Fetzner provided her Private Information to Defendant.

77. After the Data Breach, Plaintiff Fetzner experienced an increase in spam calls and communications. Further, starting in September 2026, Plaintiff Fetzner experienced multiple instances of unauthorized retail accounts being opened in her name with multiple different businesses.

78. As a result of the Data Breach, and concerning incidents, Plaintiff Fetzner has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Fetzner has also spent several hours dealing with the Data Breach, valuable time Plaintiff Fetzner otherwise would have spent on other activities, including, but not limited to, work and recreation.

79. As a result of the Data Breach, Plaintiff Fetzner has suffered anxiety due to the public dissemination of Plaintiff Fetzner's personal information, which Plaintiff Fetzner believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using her Private Information for purposes of identity theft and fraud. Plaintiff Fetzner is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

80. Plaintiff Fetzner suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of Plaintiff Fetzner's Private Information, a form of property that Defendant obtained from her; (b) violation of Plaintiff Fetzner's privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

81. As a result of the Data Breach, Plaintiff Fetzner anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data

Breach. And, as a result of the Data Breach Plaintiff Fetzner is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

## V. CLASS REPRESENTATION ALLEGATIONS

82. Plaintiff brings this action on behalf of herself and, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), a Class of:

> All persons in the United States whose Private Information was accessed in the Data Breach.

Excluded from the Class are Defendant, its executives and officers, and the Judge(s) assigned to this case and the judge's court staff and immediate family. Plaintiff reserves the right to modify, change or expand the Class definition after conducting discovery.

83. Numerosity: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. The exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiff only through the discovery process. On information and belief, the number of affected individuals estimated to be in the tens of thousands due to the scale of Defendant's operations. The members of the Class will be identifiable through information and records in Defendant's possession, custody, and control.

84. Existence and Predominance of Common Questions of Fact and Law: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a. When Defendant learned of the Data Breach;

b. Whether hackers obtained Class members' Private Information via the Data Breach;

c. Whether Defendant's response to the Data Breach was adequate;

d. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

e. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

f. Whether Defendant owed a duty to safeguard their Private Information;

g. Whether Defendant breached its duty to safeguard Private Information;

h. Whether Defendant had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class members;

i. Whether Defendant breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class members;

j. Whether Defendant's conduct violated the FTCA;

k. Whether Defendant's conduct was negligent;

l. Whether Defendant's conduct was *per se* negligent;

m. Whether Defendant was unjustly enriched;

n. What damages Plaintiff and Class members suffered as a result of Defendant's misconduct;

o. Whether Plaintiff and Class members are entitled to actual and/or statutory damages; and

p. Whether Plaintiff and Class members are entitled to additional credit or identity monitoring and monetary relief.

85. <u>Typicality</u>: Plaintiff's claims are typical of the claims of the Class as Plaintiff and all members of the Class had their Private Information compromised in the Data Breach. Plaintiff's claims and damages are also typical of the Class because they resulted from Defendant's uniform wrongful conduct. Likewise, the relief to which Plaintiff is entitled to is typical of the Class because Defendant has acted, and refused to act, on grounds generally applicable to the Class.

86. Adequacy: Plaintiffs is an adequate class representative because her interests do not materially or irreconcilably conflict with the interests of the Class she seeks to represent, she has retained counsel competent and highly experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the Class. Neither Plaintiff nor hrt counsel have any interests that are antagonistic to the interests of other members of the Class.

87. Superiority: Compared to all other available means of fair and efficient adjudication of the claims of Plaintiff and the Class, a class action is superior. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Members of the Class can be readily identified and notified based on, *inter alia*, Defendant's records and databases.

## VI. CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(By Plaintiff on behalf of the Class)**

88. Plaintiff incorporates and realleges all allegations in Paragraphs 1 through 87 as if fully set forth herein.

89. Defendant owes a duty of care to protect the Private Information belonging to Plaintiff and Class members. Defendant also owes several specific duties including, but not limited to, the duty:

a. to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

b. to protect Private Information belonging to current and former employees, guests, and convention attendees using reasonable and adequate security procedures and systems compliant with industry standards;

c. to have procedures in place to detect the loss or unauthorized dissemination of Private Information in its possession;

d. to employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class members pursuant to the FTCA;

e. to implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f. to promptly notify Plaintiff and Class members of the Data Breach, and to precisely disclose the type(s) of information compromised.

90. Defendant also owes this duty because it had a special relationship with Plaintiff's and Class members. Plaintiff and Class members entrusted their Private Information to Defendant on the understanding that adequate security precautions would be taken to protect this information. Furthermore, only Defendant had the ability to protect its systems and the Private Information stored on them from attack.

91. Defendant also owes this duty because it had a special relationship with resort guests and convention attendees as a common law inn-keeper and invitee.

92. Defendant also owes this duty because industry standards mandate that Defendant protect its current and former employees', guests', and convention attendees' confidential Private Information.

93. Defendant also owes a duty to timely disclose any unauthorized access and/or theft of the Private Information belonging to Plaintiff and Class members. This duty exists to provide Plaintiff and Class members with the opportunity to undertake appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their Private Information.

94. Defendant breached the duties it owed to Plaintiff and Class members by failing to take reasonable appropriate measures to secure, protect, and/or otherwise safeguard their Private Information.

95. Defendant also breached the duties it owed to Plaintiff and Class members by failing to timely and accurately disclose that their Private Information had been improperly acquired and/or accessed.

96. As a direct and proximate result of Defendant's conduct, Plaintiff and Class members were damaged. These damages include, and are not limited to:

- Lost or diminished value of their Private Information;
- Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information;
- Lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges; and
- Permanently increased risk of identity theft.

97. Plaintiff and Class members were foreseeable victims of any inadequate security practices on the part of Defendant and the damages they suffered were the foreseeable result of the aforementioned inadequate security practices.

98. In failing to provide prompt and adequate individual notice of the Data Breach, Defendant also acted with reckless disregard for the rights of Plaintiff and Class members.

99. Plaintiff and Class members are entitled to damages in an amount to be proven at trial and injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class members.

**COUNT II**
**NEGLIGENCE *PER SE***
**(By Plaintiff on behalf of the Class)**

100. Plaintiff incorporates and realleges all allegations in Paragraphs 1 through 87 as if fully set forth herein.

101. Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, imposes a duty on Defendant to provide fair and adequate data security to secure, protect, and/or otherwise safeguard the Private Information of Plaintiff and Class members.

102. Defendant violated the FTCA by failing to provide fair, reasonable, or adequate computer systems and data security practices to secure, protect, and/or otherwise safeguard Plaintiff's and Class members' Private Information.

103. Defendant's failure to comply with the FTCA constitutes negligence *per se*.

104. Plaintiff and Class members are within the class of persons that the FTCA is intended to protect.

105. The relevant portions of the FTCA inform Defendant's duties, particularly with regard to Defendant's duty to protect Private Information in its possession.

106. It was reasonably foreseeable that Defendant's breach of its duties, by failing to protect and secure Plaintiff's and Class members' Private Information in compliance with the

FTCA's standards, would result in that information being accessed and stolen by unauthorized actors and cybercriminals.

107. As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class members have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to theft of their personal information, damages from the lost time and effort to mitigate the impact of the Data Breach, and permanently increased risk of identity theft.

108. Plaintiff and Class members are entitled to damages in an amount to be proven at trial and injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class members.

## COUNT III
## BREACH OF IMPLIED CONTRACT
**(By Plaintiff on behalf of the Class)**

109. Plaintiff incorporates and realleges all allegations in Paragraphs 1 through 87 as if fully set forth herein.

110. Plaintiff and Class members provided Defendant with their Private Information as an integral and necessary part of receiving lodging and services. Plaintiff and the Class also provided payment to Defendant in exchange for receiving these services.

111. During the transaction of these services for payment, Plaintiff and the Class, on one hand, and Defendant, on the other hand, entered into implied-in-fact contracts which included a provision that Defendant would safeguard and protect the confidentiality of Private Information belonging to Plaintiff and the Class. In effect, Defendant agreed to provide reasonable and adequate data security to Private Information in its possession.

112. The terms of these implied contracts, including the provision requiring Defendant to maintain reasonable data security measures, are described in federal laws, state laws, and industry standards, as alleged above. In addition, Defendant expressly adopted and assented to these terms in its public statements, representations and promises as described above.

113. The implied contracts for data security also obligated Defendant to provide Plaintiff and Class members with prompt, timely, and sufficient notice of any and all unauthorized access or theft of their Private Information, as is consistent with industry custom and statutory requirements.

114. Defendant breached these implied contracts by failing to take, develop and implement adequate policies and procedures to safeguard, protect, and secure the Private Information belonging to Plaintiff and Class members; allowing unauthorized persons to access Plaintiff's and Class members' Private Information; and by failing to provide prompt, timely, and sufficient notice of the Data Breach to Plaintiff and Class members, as alleged above.

115. As a direct and proximate result of Defendant's breaches of the implied contracts, Plaintiff and Class members have been damaged as described herein, will continue to suffer injuries as detailed above due to the continued risk of exposure of Private Information. Thus, Plaintiff and Class members are entitled to damages in an amount to be proven at trial and injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class members.

**COUNT IV**
**UNJUST ENRICHMENT**
**(By Plaintiff on behalf of the Class)**

116. Plaintiff incorporates and realleges all allegations in Paragraphs 1 through 87 as if fully set forth herein.

117. This count is brought in the alternative to Count III.

118. Plaintiff and the Class have a legal and equitable interest in their Private Information that was collected and maintained by Defendant.

119. Plaintiff and the Class conferred payment to Defendant in exchange for lodging and other services, and as an integral part of this transaction also conferred their Private Information to Defendant.

120. Plaintiff and Class members conferred their payment and Private Information with the understanding that a portion of the payment would be used to implement data security sufficient to adequately protect their Private Information. As such, a portion of the conferred payment represented a benefit that was to be used for a specific purpose.

121. Defendant was directly benefitted by the payments it received from Plaintiff and Class members, as these payments represented revenue that it used for business purposes and financial gain. As alleged above Defendant knew, or should have known, that it was supposed to spend a portion of its revenues on adequate data security measures to prevent the theft or compromise of Private Information.

122. However, upon information and belief, Defendant did not spend that portion of its revenues on adequate data security measures such as employee training, operation protocols, and firewalls, that would have prevented the Data Breach. Instead, upon information and belief, it opted for cheaper and inadequate data security measures and elected to increase its profits instead.

Thus, Defendant knowingly and opportunistically elected to increase its own profits at the expense of Plaintiff and Class members.

123. By refusing to spend on data security the part of the payment that was conferred with that express purpose, Defendant knowingly and deliberately enriched itself at the expense of Plaintiff and Class members. This represents an inequitable, unfair, and unconscionable practice and state of affairs.

124. Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain its engorged profits which it unfairly and unconscionably gained at the expense of Plaintiff and Class members.

125. Defendant is therefore liable to Plaintiff and the Class for restitution in the amount of the benefit conferred on Defendant as a result of its wrongful conduct, including specifically the enhanced profits Defendant gained by not implementing and adopting reasonable data security measures that would have prevented the Data Breach. Plaintiff and Class members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct.

## COUNT VI
## DECLARATORY JUDGMENT
**(By Plaintiff on behalf of the Class)**

126. Plaintiff incorporates and realleges all allegations in Paragraphs 1 through 87 as if fully set forth herein.

127. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

128. In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiff alleges that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiff and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

129. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b. Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c. Defendant breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

d. Defendant breaches of its duties caused—and continues to cause—injuries to Plaintiff and Class Members.

130. The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

131. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

132. And if a second breach occurs, Plaintiff and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiff and Class Members' injuries.

133. If an injunction is not issued, the resulting hardship to Plaintiff and Class Members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

134. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class Members, and the public at large.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually, and on behalf of all members of the Class, respectfully requests that the Court enter judgment in their favor and against Defendant, as follows:

A. That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is a proper class representative; and appoint Plaintiff's Counsel as Class Counsel;

B. That the Court grant permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein;

C. That the Court award Plaintiff and Class members compensatory, consequential, and general damages in an amount to be determined at trial;

D. That the Court award Plaintiff and Class members statutory damages, and punitive or exemplary damages, to the extent permitted by law;

E. That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

F. That the Court award pre- and post-judgment interest at the maximum legal rate;

G. That the Court award grant all such equitable relief as it deems proper and just, including, but not limited to, disgorgement and restitution; and

H. That the Court grant all other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the putative Class, demands a trial by jury on all issues so triable.

Date: November 19, 2026

Respectfully Submitted,

*/s/ Nickolas J. Hagman*
Nickolas J. Hagman (Wis. Bar. No. 1085424)

Alex Lee*
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, Illinois 60603
Telephone: (312) 782-4880
Facsimile: (312) 782-4885
nhagman@caffertyclobes.com
alee@caffertyclobes.com

* *Pro Hac Vice* forthcoming

*Attorneys for Plaintiffs and the Proposed Class*